IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL DONNELLY, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 16-1128 |
| | : | |
| v. | : | |
| | : | |
| KUTZTOWN AREA TRANSPORT | : | |
| SERVICE, INC., CLARENCE E. HOWELL, | : | |
| and MATTHEW K. ANGSTADT, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                July 29, 2016

The plaintiff, Michael Donnelly ("Donnelly"), a student at Kutztown University (the "University") in 2014, has sued a provider of emergency medical care (but not the University) and two of its employees in connection with an underage drinking incident on campus. The essentials of the incident are largely undisputed. Corporal Paul Long ("Corporal Long") of the University's Department of Public Safety responded to a call from a building administrator concerning the presence of alcohol in Donnelly's dorm room. After observing that Donnelly appeared to be visibly intoxicated, Corporal Long administered a breath test, which registered a blood-alcohol concentration of 0.111%. Upon obtaining this result, Corporal Long put in a call for an alcohol evaluation. He requested an evaluation only of Donnelly, despite there being six other underage students in the room who had admitted to alcohol use. In turn, and after being notified through a chain-of-communication that the University required its services, the defendant, Kutztown Area Transport Service, Inc. ("KATS"), through its employees, arrived on the scene and ultimately transported Donnelly to the hospital. Although Donnelly's blood-

alcohol concentration had risen to a level of 0.124% by the time he was evaluated at the hospital, he was released in short order.

The broader context of this incident is, in contrast, hotly disputed as Donnelly maintains that he has fallen victim to the "Kutztown Special."[1]  While the precise nature and breadth of this scheme remains unclear, Donnelly suggests that it is something like a tacit conspiracy between the University and KATS to exploit college underage drinking—an "alcohol epidemic"[2]—for their mutual benefit.  While University police officers would create the conditions for a medical transport, the conspiracy goes, KATS would then bill students for unnecessary medical expenses.  In return, the University would be able to insulate itself from any liability related to an intoxicated student's actions by getting him or her off the campus and into a hospital until he or she sobered up.  The defendants naturally take issue with this characterization of what they view as an otherwise routine business (no doubt public-service oriented) relationship.

With this dispute came litigation and Donnelly now seeks to expose the conspiracy through the courts.  In addition to a variety of state-law claims, he advances a claim under 42 U.S.C. § 1983 based on a violation of his Fourth Amendment rights.  But he has only sued private actors and such a claim requires some form of state (governmental) action.  So he argues that the conspiracy can move this case from the private to the public realm.  Because the parties have conducted discovery with respect to the state-action issue, evidence must support this argument.  Unfortunately for Donnelly, the evidence actually produced would not allow a reasonable jury to credit his state-action argument.  The court therefore enters judgment in favor of the defendants on the section 1983 claim.  All is not lost for Donnelly, however, for he

---

[1] The court takes this phrase from the complaint.  *See* Compl. (Ex. A to Notice of Removal) at ¶ 38, Doc. No. 1.
[2] Again, these are Donnelly's words.  *See* Pl.'s Br. Opposing Summ. J. ("Pl.'s Resp.") at 4, Doc. No. 20-22.

originally wanted to be in state court.  He is only here because of the removal process.  With the federal claim out of the picture, he will get his first-choice forum back.

## I.      PROCEDURAL HISTORY

Donnelly commenced this action by filing a complaint against the defendants, KATS and two of its employees (Clarence E. Howell ("Howell") and Matthew K. Angstadt ("Angstadt")), on February 2, 2016, in the Court of Common Pleas of Bucks County.  *See* Compl.  Before filing a response to the complaint, the defendants removed this matter to federal court on March 10.  *See* Notice of Removal, Doc. No. 1.  They subsequently filed a motion to dismiss on March 18.  *See* Mot. to Dismiss, Doc. No. 3.  In that motion, the defendants asked the court to dismiss not only Donnelly's section 1983 claim, but also to dismiss one of his various state-law claims and to strike his request for punitive damages as well.  *See id.*  Noting that the vitality of Donnelly's federal claim, as the only claim anchoring this court's original jurisdiction, would likely be forum-determinative, the court ordered expedited discovery on the state-action issue (the sole ground raised concerning the dismissal of the section 1983 claim) and reserved discussing any other issues.  *See* Order, Doc. No. 5.  After the completion of discovery, the defendants filed a motion for summary judgment on June 8 limited to the issue of state action.  *See* Mot. for Summ. J., Doc. No. 17.  Donnelly filed his response to the motion on June 22.  *See* Pl.'s Resp.  The defendants filed a reply brief on June 28.  *See* Reply, Doc. No. 21.  The court held oral argument on July 1.

## II.      FACTUAL BACKGROUND

For purposes of setting up the state-action analysis, the following facts are recited after viewing the summary judgment record in the light most favorable to Donnelly, which essentially

means that the court credits his story.[3]   The court begins with some contextual facts and moves towards the particulars surrounding Donnelly's February 5, 2014 encounter with KATS.

KATS is the primary emergency medical services provider for the University, having continuously served it since 1984.  *See* Pl.'s Statement of Facts at ¶¶ 49-50, Doc. No. 20.  "On average, KATS conducts 350 transports from the grounds of [the University] each year."  *Id.* at ¶ 51 (footnote omitted).  KATS operates from a location that is a "2.0 mile drive away from the center of campus."  Defs.' Statement of Facts at ¶ 4, Doc. No. 17; *see* Pl.'s Statement of Facts at ¶ 4.  In some contrast to the University itself, KATS is a "private business entity."  Pl.'s Statement of Facts at ¶ 5; *see* Defs.' Statement of Facts at ¶ 5.

In addition to providing emergency medical services, KATS "also provided taxi-style transportation for students going to off-campus medical, non-emergency appointments on a year to year basis beginning . . . with the 2015/2016 school year."  Defs.' Statement of Facts at ¶¶ 6-7; *see* Pl.'s Statement of Facts at ¶¶ 6-7.  Moreover, "KATS, along with other local ambulance agencies, would provide standby services during university functions, such as during commencement proceedings and athletic events, on a per event, as-needed basis."  Defs.' Statement of Facts at ¶ 9; *see* Pl.'s Statement of Facts at ¶¶ 9, 56.  Besides providing these services to students, KATS trained University police "in the use of Narcam [sic],[4] an overdose treatment designed to reverse the effects of a narcotic overdose."  Defs.' Statement of Facts at ¶ 8; *see* Pl.'s Statement of Facts at ¶ 8.  KATS also helped the University in drafting applicable protocols concerning its use.  *See* Pl.'s Statement of Facts at ¶ 53.

---

[3] Although perhaps unnecessary, the court actually gives Donnelly the benefit of a doubly-deferential approach.  Not only does the court credit his version of the events, but the court also presumes, despite arguments to the contrary, that the entirety of this version is backed up by competent evidence.
[4] The correct spelling of this antidote appears to be Narcan.

A collaborative relationship between KATS and the University also seems to have played a role in formulating (perhaps "reformulating" would be more accurate) University policy initiatives dealing with college drinking.[5]  *See* Pl.'s Statement of Facts at ¶ 10.  Originally, the University drafted its "policy governing the handling of intoxicated students" at a time when its Health Center operated around the clock.  *Id.* at ¶ 32.  In part, the purpose of such a policy is to "insulate [the University] police department from liability."  *Id.* at ¶ 42.  The policy at that time mandated that the appropriate personnel transport any intoxicated student to the Health Center for evaluation and, if necessary, treatment.  *See id.* at ¶ 33.  At some point, the University revised its policy when the Health Center "ceased operating 24-hours a day."[6]  *Id.* at ¶ 34.  According to the revised policy, University police officers "were required to transport intoxicated students to the Health Center if it was open; otherwise, police were required to notify the appropriate emergency medical unit for evaluation and transportation to a medical facility."  *Id.* at ¶ 35 (internal quotation marks omitted).  The University once again revised its policy "as a result of a meeting that took place . . . at the University."  *Id.* at ¶ 37 (internal quotation marks omitted).  Both KATS and the Director of the EMS Council were in attendance.  *See id.* (internal quotation marks omitted).  The major policy change stemming from this meeting revolved around the recording of a student's blood-alcohol concentration.[7]  *See id.* at ¶ 38.  Culminating in its current form, the policy underwent a final revision in 2013 in identifying Central Processing as another location where intoxicated students could be transported.  *See id.* at ¶ 39.

---

[5] At one point, "KATS appeared before the Maxatawny Township Board of Supervisors and requested the assessment of an EMS fee upon each student of [the University]."  Pl.'s Statement of Facts at ¶ 54.  The University, in turn, "submitted a statement in support of KATS'[s] application to the Pennsylvania Public Utilities Commission."  *Id.* at ¶ 57.

[6] "The Health Center's operating hours went from 24 hours a day, to being closed from 11:00 p.m. until 7:00 a.m. and finally to the current operating hours of Monday through Friday, 8:00 a.m. until 4:30 p.m."  *Id.* at ¶ 36.

[7] At the time of the underlying incident, neither Corporal Long nor his fellow officers knew that the University had revised its alcohol policy to include the listing of a student's blood-alcohol concentration.  *See id.* at ¶ 41.

Within the framework of University policy, a certain course of conduct is called for when the University receives a call regarding underage drinking.  University police officers are initially "authorized to evaluate an underage student for potential intoxication by observing physical clues such as slurred speech, a positive preliminary breath test, red glassy eyes, alcohol odor, and swaying while standing."  Defs.' Statement of Facts at ¶ 12; *see* Pl.'s Statement of Facts at ¶ 12.  As relevant to this case, an officer is then authorized to request an alcohol evaluation of a student with a blood-alcohol concentration of 0.08%-0.12%, presumably by an entity like KATS, "only if [the student] is exhibiting signs of intoxication that renders [him or her] a danger to [himself or herself] or others."  Pl.'s Statement of Facts at ¶ 13 (internal quotation marks omitted).  As a logistical matter, "[t]he call for an alcohol evaluation is a three-prong process by which the responding officer contacts Kutztown University's dispatch, who relays the call to Berks County Communication Center, who will then contact EMS."  Defs.' Statement of Facts at ¶ 14 (internal quotation marks omitted); *see* Pl.'s Statement of Facts at ¶ 14.  In the majority of cases, KATS serves as the responding EMS agency.  *See* Pl.'s Statement of Facts at ¶ 15.  Should KATS be unavailable, however, another local ambulance company will respond to the University's call.  *See id.*

Upon arrival to the scene, "the responding medics determine[] if the student [should be] transported."  *Id.* at ¶ 43.  Although the extent of such influence is unclear, University police officers may have some say in the decision to transport.[8]  *See id.* at ¶ 16.  While there have been instances where "students are permitted to refuse to be transported," this may only occur if "Medical Command approves the student's request to not be transported."  *Id.* at ¶ 11; *see id.* at ¶ 17.  KATS's internal policy is to "transport every person who is under 21 and has a BAC above

---

[8] This uncertainty will become important later.

6

.02." *Id.* at ¶ 52.  "Corporal Long suspects KATS [has transported] students that did not need to be transported." *Id.* at ¶ 44.

Consistent with the observation that "[m]ost incidents involving intoxicated students occur when the Health Center is closed," the University engaged the response mechanism described above in the early morning hours of February 5, 2014, when Corporal Long responded to a call involving the presence of alcohol in Donnelly's dorm room.  *Id.* at ¶ 40; *see* Donnelly Decl. at ¶¶ 3-5, Doc. No. 20-3; *see also* Defs.' Statement of Facts at ¶ 18; Pl.'s Statement of Facts at ¶ 18.  Upon viewing Donnelly, Corporal Long noticed that he had "bloodshot eyes," that he smelled of alcohol, and that he swayed from "side to side."  Defs.' Statement of Facts at ¶ 19; *see* Pl.'s Statement of Facts at ¶ 19.  Based on these "physical clues," Corporal Long administered a "breath test with an Alco-Sensor 3 which showed a reading of .111."  Defs.' Statement of Facts at ¶ 20; *see* Pl.'s Statement of Facts at ¶ 20.  Corporal Long then determined that an alcohol evaluation was required.  *See* Defs.' Statement of Facts at ¶ 21; Pl.'s Statement of Facts at ¶ 21.  Despite their having admitted to alcohol use, Corporal Long did not call for an alcohol evaluation of the other six underage students who were present in the room with Donnelly.  *See* Defs.' Statement of Facts at ¶¶ 22-23; Pl.'s Statement of Facts at ¶¶ 22-23.

Although the precise nature of the chain-of-communication leading to KATS's arrival on campus remains unclear, the Patient Care Report indicates that Howell and Angstadt were the responding medics.  *See* Pl.'s Statement of Facts at ¶ 24.  Upon their arrival to campus, Donnelly "admitted to alcohol use."  Defs.' Statement of Facts at ¶ 26; *see* Pl.'s Statement of Facts at ¶ 26.  KATS ultimately transported Donnelly to the hospital, but he disputes that he "freely" consented to the transport.  Pl.'s Statement of Facts at ¶ 27.  During the ride, Donnelly received saline solution through an IV.  *See* Defs.' Statement of Facts at ¶ 28; Pl.'s Statement of Facts at ¶ 28.

When checked at the hospital, his blood-alcohol concentration had risen to a level of 0.124%. *See* Defs.' Statement of Facts at ¶ 30; Pl.'s Statement of Facts at ¶ 30.  He was discharged from the hospital "at approximately 6:12 a.m."[9]  Compl. at ¶ 29.

In the aftermath of the incident, Corporal Long issued Donnelly a "Non-Traffic Citation for underage drinking."  Donnelly Decl. at ¶ 11.  In addition, KATS sent him an invoice in the amount of $1,516.80.  *See id.* at ¶ 12.  Alongside a "$300.00 fine and court costs," he paid restitution to KATS "for the cost of the ambulance transport."  *Id.* at ¶ 13.

That Donnelly had to pay KATS restitution was not out of the ordinary.  Pursuant to the directive of a local magisterial district judge, "billings issued by KATS to students" who had been "transported via ambulance were included . . . as restitution on all summary citations involving EMS transport."  Pl.'s Statement of Facts at ¶ 46.  "To date, [the local court] [has] collected at least $65,642.39 in restitution payments from students and other individuals transported by KATS."  *Id.* at ¶ 47.  Further, the local court "did not include as restitution or otherwise collect the charges of any other EMS provider other than KATS."  *Id.* at ¶ 48.

### III.   DISCUSSION[10]

#### A.   <u>Standard – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[9] While the court takes this fact from the complaint, neither party suggests that discovery has revealed this to be inaccurate.
[10] The court has subject-matter jurisdiction over Donnelly's section 1983 claim pursuant to 28 U.S.C. §§ 1331 and 1343, and jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367.

entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 105 (3d Cir. 2012)

(quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it

"might affect the outcome of the suit under the governing law." *Id.*

   The party moving for summary judgment has the initial burden "of informing the district

court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met

this burden, the non-moving party must counter with "'specific facts showing that there is a

genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587

(1986) (citation omitted); *see* Fed. R. Civ. P. 56(c)(1) (stating that "[a] party asserting that a fact .

. . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in

the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a

genuine dispute").

   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position

will be insufficient." *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015)

(internal quotation marks and citation omitted).  Bare assertions, conclusory allegations, or

suspicions are insufficient to defeat summary judgment.  *See Fireman's Ins. Co. v. DuFresne,*

676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary

judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions");

*Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that

"speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007) (citation omitted).  The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

## B.   Analysis

Beginning with the statute itself, section 1983 provides:

> Every person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).  In line with the emphasized text, "[t]o establish a claim under § 1983, [Donnelly] must show that the defendants 1) were state actors who 2) violated his rights under the Constitution or federal law." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169-70 (3d Cir. 2004) (Alito, J.) (footnote and citation omitted).  "The 'under color of state law' analysis is equivalent to the 'state action' analysis." *Sprauve v. West Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (citation omitted).  Contrary to decisions that may suggest otherwise, this is a merits-based inquiry that does not implicate subject-matter jurisdiction as long as the state-action argument is non-frivolous.  *See Abulkhair v. Liberty Mut. Ins. Co.*, 441 F. App'x 927, 929 n.1 (3d Cir. 2011) (observing that a prior panel has "held that the section 1983 requirement of state action is not jurisdictional" (citation omitted)); *Albert v. Carovano*, 824 F.2d 1333, 1338 (2d Cir. 1987) (stating that "because the [plaintiffs'] federal claims are neither frivolous nor immaterial, and because [the defendant's] motion is based solely on the lack of any action by the defendants under color of state law, we treat the motion as an attack on the merits of the claim" (citations omitted)).  Because Donnelly's decision to sue private actors under section 1983 on these facts does not border on the frivolous, federal jurisdiction is never in doubt.

On the merits, then, the "touchstone" of the state-action inquiry centers on the proposition that "state action may be found if, though only if, there is such a close nexus between the [s]tate and the challenged action that seemingly private behavior may be fairly treated as that of the [s]tate itself." *P.R.B.A. Corp. v. HMS Host Toll Rds., Inc.*, 808 F.3d 221, 224 (3d Cir. 2015) (internal quotation marks and citations omitted).  To put it somewhat differently, "[t]he central purpose of this inquiry is to assure that constitutional standards are invoked when it can be said that the [s]tate is *responsible* for the specific conduct of which the plaintiff complains." *Hammond v. City of Wilkes-Barre*, 600 F. App'x 833, 837 (3d Cir. 2015) (emphasis in original)

(internal quotation marks and citation omitted).   "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity."   *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).   Perhaps as a consequence, "the facts are crucial . . . and it is only by sifting facts and weighing circumstances [that] the nonobvious involvement of the [s]tate in private conduct [can] be attributed its true significance."   *Hammond*, 600 F. App'x at 837 (internal quotation marks and citations omitted).

Distilling the state-action analysis even further, the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists:

> (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotation marks and citation omitted). No doubt adding to the idea that state action is a "protean concept," different iterations of the principles encased in these "three broad tests" abound.[11]   *Sprauve v. West Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (internal quotation marks and citation omitted).   For example, and without purporting to announce any formal tests, the Third Circuit has framed the state-action inquiry as something like an exercise in categorization:

> Armed with that body of law, we have endeavored to determine whether state action exists in circumstances including where an activity is significantly encouraged by the state, where the state acts as a joint participant, and where an actor performs a function designated by the state, or is entwined with government policies or management.

---

[11] The Ninth Circuit has gone so far as to remark that "[t]he Supreme Court has identified at least seven such approaches."   *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 924 (9th Cir. 2011) (citation omitted).

*Id.* (internal quotation marks and citation omitted).[12]  Although some judges may question the vitality, and wisdom, of one approach over another, it appears that the "discrete test approach" has purchased some staying power.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1156-58 (3d Cir. 1995) (Greenberg, J., concurring); *see Win & Son, Inc. v. City of Philadelphia*, No. CV 13-5977, 2016 WL 538213, at *6 (E.D. Pa. Feb. 11, 2016) (reciting the "three broad tests"); *Robinson v. Family Dollar, Inc.*, No. CV 14-03189, 2015 WL 6689850, at *3 (E.D. Pa. Nov. 3, 2015) (same).  And if the Third Circuit "attempt[s] to align the case at hand with the Supreme Court case most factually akin to it," then the "discrete test approach," not unlike the other approaches, might be useful in identifying "the most promising analytical point of departure." *Leshko v. Servis*, 423 F.3d 337, 339, 340 n.2 (3d Cir. 2005) (citations omitted).  Indeed, the parties in this case may themselves have found such use, considering that they all adhere to that approach.  *See* Defs.' Mot. for Summ. J. at 10-14, Doc. No. 17; Pl.'s Resp. at 2-4.  Keeping in mind that the ultimate "touchstone" of the state-action inquiry must always guide the way, the court will follow the parties' lead in applying the "discrete test approach."

For his part, Donnelly argues that KATS may be considered a state actor under any of the "three broad tests" given the state of the summary judgment record.  *See* Pl.'s Resp. at 2.  But besides providing the court with legal authority supporting the fact that such tests are indeed recognized in the Third Circuit, he offers absolutely no authority supporting their application to the record.  He states in his brief that, "[a]s will be more fully presented at oral argument, the cases holding that a private ambulance company is not a state actor are easily distinguished." *Id.*

---

[12] Seemingly in furtherance of this approach, the Third Circuit has explicitly noted that "[s]tate action cases broadly divide into two factual categories." *Leshko v. Servis*, 423 F.3d 337, 340 (3d Cir. 2005) (citation omitted).  "The first category involves an *activity* that is significantly encouraged by the state or in which the state acts as a joint participant." *Id.* (emphasis in original) (citations omitted).  "The second category of cases involves an *actor* that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." *Id.* (emphasis in original) (citations omitted).

at 4.  The absence of any attempt to engage in this exercise in writing prior to argument is a bit unfortunate, however, especially because "examples may be the best teachers" when it comes to state action.[13]  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).  Nevertheless, and with the benefit of oral argument, the court takes up his invitation to examine whether this case is, in fact, unique enough to overcome what other courts have characterized as a "presumption that private conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (citations omitted).

Turning first to the so-called "public function test," Donnelly makes a two-pronged argument that the University effectively delegated "the power to arrest and the obligation to provide health services"—in other words, seemingly public functions—to KATS.  Pl.'s Resp. at 3; *see Schutt v. Melmark, Inc.*, No. CV 15-2731, 2016 WL 2622375, at *3 (E.D. Pa. May 9, 2016) (recognizing the "the public function test" (internal quotation marks and citation omitted)). "[T]his test imposes a rigorous standard that is rarely . . . satisfied."  *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 165 (3d Cir. 2001) (Alito, J.) (internal quotation marks and citation omitted). In substance, it "requires the court to determine whether the defendant was performing a function that is traditionally and exclusively the province of the state."  *Schutt*, 2016 WL 2622375, at *3 (internal quotation marks and citation omitted).  Neither prong of Donnelly's argument survives scrutiny under this "rigorous standard."

Concerning the arrest power, Donnelly contends that the University "was having KATS make arrests [and unlawful ones at that] to conserve its own police resources, and in an effort to

---

[13] Some judges have invoked the doctrine of waiver in somewhat similar circumstances.  *See DeSousa v. City of Philadelphia*, No. CIV.A. 11-3237, 2012 WL 2740872, at *2 n.4 (E.D. Pa. July 9, 2012) (declining to consider an argument raised for the first time at oral argument); *Doe v. Fayette Cty. Children & Youth Servs.*, No. CIV.A. 8-823, 2010 WL 4854070, at *12 (W.D. Pa. Nov. 22, 2010) (declining to address an underdeveloped argument) (citation omitted).  Because, given the totality of information and argument currently in the record, the court can meaningfully situate this case within the bounds established in other cases, the court takes a different path and addresses Donnelly's arguments head-on.

shield itself from claims by students and others that its practices were unconstitutional."  Pl.'s Resp. at 2.  But Donnelly's use of the phrase "make arrests," when viewed against the record, is imprecise.  One can assist the police, even in a medical capacity, without being exposed to the strictures of the Constitution.  *See Dennis v. DeJong*, 867 F. Supp. 2d 588, 647 (E.D. Pa. 2011) (observing that the Third Circuit has "held that [a] first-aid squad was not a state actor for section 1983 purposes even though it received public funds, it functioned to support the police, and it responded twice to the request of the police to aid a man in police custody" (citation omitted)). The delegation of the arrest power involves something more, probably much more.  *See United States v. Day*, 591 F.3d 679, 688 (4th Cir. 2010) (turning to state law in giving meaning to the statement that "even assuming we would agree . . . that plenary arrest authority alone could transform a private individual into a state actor, Officers Costa and Slader did not possess the same power to make warrantless arrests afforded to Virginia police officers"); *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) (stating that "[w]here private security guards are endowed *by law* with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test" (emphasis in original and added) (citations omitted)).  Both the arguments and record created by Donnelly do not even begin to bear out that "something more" as it concerns KATS.

With respect to the function of providing health services, Donnelly argues that the University "was delegating to KATS its duty and obligation to provide medical treatment to its students where, as here, [the University] dramatically reduced the staffing and hours of operation of the . . . Health Center."  Pl.'s Resp. at 2-3.  Unfortunately, and as has happened elsewhere, "[Donnelly] has not referred [the court] to any case holding that the provision of emergency services is a function traditionally associated with state sovereignty, and every decision [the

court has] located has reached the opposite conclusion." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265–66 (2d Cir. 2014) (citations omitted).  And even if the record supports a finding that KATS provided the University with services that ventured a bit beyond strictly "emergency services," Donnelly makes no attempt whatsoever to show that those services are traditional and exclusive public functions.  With that, Donnelly has "failed to meet [his] burden [a burden of production] of demonstrating" that KATS "was performing an exclusive government function." *Groman v. Township of Manalapan*, 47 F.3d 628, 641 (3d Cir. 1995).

But Donnelly still has two more tests at his disposal, so the court moves on to the next one, namely the "joint action test." *Greenberg v. Caesars Entm't Corp.*, No. CV 14-4796, 2016 WL 1106885, at *7 n.8 (E.D. Pa. Mar. 21, 2016) (calling the second test the "joint action test" (internal quotation marks omitted)).  As one court has put it, this test is satisfied if "(1) the private entity has a prearranged plan with the police officers, and (2) under the plan, the police officers will substitute their [own] judgment with that of the private entity's." *Id.* (internal quotation marks and citation omitted).  Even assuming that Donnelly has satisfied the first prong,—in other words, even assuming that his conspiracy theory is grounded in record evidence—he cannot satisfy the second prong.  To be sure, Donnelly himself confirms that KATS "almost always transported the student pursuant to *its policy* [of] transporting young adults who have not yet attained majority, but not the legal drinking age with a reported BAC of .02 or above."  Pl.'s Resp. at 1 (emphasis added).  To state it in different terms, although Donnelly has attempted to show both that KATS exerted influence over the University in crafting University policy and that University police tried to coerce students to submit to a medical transport, the defendants have carried their ultimate summary judgment burden in

showing that there is no non-speculative evidence to support the notion that the University intruded upon the range of judgment exercised by KATS.  *See* Pl.'s Resp. at 3.  In short, "[t]here is no evidence that the [University] controlled [KATS's] professional conduct."  *Groman*, 47 F.3d at 642 (citation omitted).  Without this element of control or influence, the "joint action test" is of no use to Donnelly.

In his final attempt, Donnelly maintains that state action can be established under the third test in that the University "has insinuated itself into a position of interdependence" with KATS.  *Becker v. City Univ. of Seattle*, 723 F. Supp. 2d 807, 813 (E.D. Pa. 2010) (internal quotation marks and citation omitted).  "To satisfy this test, the state must have exercised coercive power or . . . provided such significant encouragement, either overt or covert, that the [challenged activity] must in law be deemed that of the [s]tate."  *Id.* (internal quotation marks and citation omitted).  "The focus of this analysis is on whether the state has exercised control over the *particular conduct* that gave rise to the plaintiff's alleged constitutional deprivation."  *Id.* (emphasis added) (internal quotation marks and citation omitted).

Given the manner in which Donnelly has chosen to structure his arguments as they relate to the particular conduct at issue, the Third Circuit has already prepared the perfect response:

> Given the relationship between the first aid squad and the Township here, we find no symbiotic relationship, joint participation, or other connection sufficient to demonstrate the first aid squad was acting under color of state law. Neither the squad's receipt of public funds, nor the police's request for the first aid squad, nor Groman's status as a person in custody at the time of the squad's second response is enough to create state action on the part of the first aid squad.  Even if the events created an affirmative obligation under the Due Process Clause for the police to provide medical care . . . this obligation did not transform the first aid squad into a state actor. As we have held, the police fulfilled their constitutional obligation by calling the first aid squad, and the first aid squad's actions do not make them state actors for purposes of § 1983.

*Groman*, 47 F.3d at 642 (citation omitted).  So too here.  Accordingly, and having staved off a finding of state action under the third and final test, the defendants have carried their ultimate summary judgment burden of persuasion and the court enters judgment in their favor on Donnelly's section 1983 claim.

Forum-placement is the final matter, since Donnelly's only federal claim is now gone. "When the claims over which a district court has original jurisdiction are resolved before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Neelu Pal v. Jersey City Med. Ctr.*, No. 14-3710, 2016 WL 3774060, at *4 n.6 (3d Cir. July 15, 2016) (emphasis in original) (internal quotation marks and citation omitted); *see Yue Yu v. McGrath*, 597 F. App'x 62, 68 (3d Cir. 2014) (affirming the district court's decision in dismissing "all of the remaining state and common law claims after awarding summary judgment to [d]efendants on all of the federal claims over which it had original jurisdiction").  Because those considerations, especially considering the expedited nature of this ruling, do not weigh in favor of retaining supplemental jurisdiction over the remainder of Donnelly's claims, seeing as they are all grounded in state law, the court declines to exercise jurisdiction over them.[14]  Instead of dismissing these claims without prejudice to their refiling in state court, though, the court will remand the state-law claims back to the Court of Common Pleas of Bucks County given this matter's initial removal to federal court.  *See Beckinger v. Township of Elizabeth*, 434 F. App'x 164, 170 (3d Cir. 2011) (finding, in a similar situation, that the district court "did not abuse its discretion in remanding [state-law] claims to the state court").

---

[14] An independent basis of jurisdiction, such as diversity jurisdiction, is not readily apparent.  Nor does Donnelly attempt to offer such a basis.

## IV.    CONCLUSION

Donnelly has aimed to make this a case about drawing inferences from established facts. But "a court is required to indulge only reasonable inferences." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 210 (3d Cir. 2001).   Because Donnelly's state-action argument unfortunately follows a series of unreasonable inferences on the record evidence actually presented, the court is constrained to grant summary judgment in favor of the defendants on his section 1983 claim.   The court remands the remaining state-law claims to state court for disposition.

The court will issue a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.